THE KENWOOD LAND COMPANY, Respondent, v. HANCOCK INVESTMENT CO. et al., Appellants.

Kansas City Court of Appeals, April 7, 1913.

1. **EQUITY: Building Restrictions: Injunction to Prevent Violation of.** Covenants in the nature of restrictions on the use of the fee are, when reasonable and within the policy of the law, valid. Although they are not favored, yet where the intention of the parties is clear, equity will enforce them. This intention must be determined from the language of the covenant itself when viewed in the light of the entire context of the instru-

ment containing the covenant. They should also be considered with reference to the situation of the property and its present and prospective use as well as to the language employed in expressing the covenant.

2. ———: **Covenants: Real Property.** If parties settle their rights to a parcel of land by covenants, these must be observed whether their nonobservance will inflict injury or not.

3. ———: ———: **Terms of.** Where the terms are such as to clearly show that the covenants are directed at the number of buildings and also the character of the occupancy or use thereof, then a building which offends in either particular is objectionable.

4. ———: ———: ———: **Relief to be Granted.** Where a person on beginning the erection of a flat or apartment house, is warned that it is a violation of the covenant, and thereupon promises to change the plan of the house so as to erect a single residence, but violates said promise and erects the house so that in reality it is a duplex or apartment house, this is sufficient to justify a chancellor in granting relief against the possible future use of the house in a forbidden way, notwithstanding the fact that at present it is not so used. Although the house, as erected, is within the terms of the covenant, yet inasmuch as, under the circumstances of this case, equity can be accomplished without resorting to the harsh expedient of removing the house, its removal should not be ordered.

5. **New Trial.** The action of the trial court should be upheld by the appellate court if possible, and especially is this true in the matter of granting a new trial.

Appeal from Jackson Circuit Court.—*Hon. O. A. Lucas,* Judge.

AFFIRMED.

*W. A. Medill* and *Beardsley & Beardsley* for appellant.

*E. C. Hall* for respondent.

TRIMBLE, J.—This is a suit by injunction to prevent the violation of certain covenants and restrictions in a deed made by the plaintiff on February 11, 1910. These covenants and restrictions were to continue in force for fifteen years from said date, and those now in controversy are as follows:

"First. During the said fifteen years said land shall be occupied and used by said party of the second part, its successors and assigns, including all tenants, for residence purposes only and not otherwise, which is to be taken to exclude flats and apartment houses.

"Second. There shall not be at any time within said fifteen years more than . . . one residence on lot four. (This is the lot on which the covenants are said to be violated).

"Sixth. To insure the keeping of each and all of said covenants, and to prevent any breach thereof, said party of the second part agrees with the owner or owners, occupant or occupants for the time being, at any time within said fifteen years, including party of the first part, of any other lot or lots within the same block with any lot hereby conveyed shall have the right to obtain from any court of competent jurisdiction an injunction, mandatory or otherwise, to prevent a breach of any of said covenants and to compel the keeping of each of said covenants by said party of the second part."

Without setting forth all the necessary allegations of the petition, it may be said that after stating the above mentioned covenants, it alleges that the defendant is erecting a building on the lot in question which is a flat or apartment house and designed to be used and occupied as such; that said building is two stories, and the arrangement of the rooms, plumbing details, etc., show a clear purpose to finish and complete a building with two apartments or two complete or separate sets of rooms of similar number and arrangement, each independent of the other, and designed for the occupancy of two separate families, one on the first floor, and the other on the second, and being in effect two separate and distinct residences. The petition further alleges that when defendants were about to begin the erection of the building they were warned in writing not to erect it in

violation of the covenants, and plaintiff was assured by defendants that they would not proceed in a manner to violate said restrictions and covenants; but that notwithstanding such warning and assurance said defendants have proceeded to erect and are now erecting on said lot a building of the character hereinbefore stated.

The petition asked first that the building be removed or the plan thereof altered and the house so reconstructed as to make it comply with said restrictions; 2nd, that defendants, their servants, tenants, occupants, successors and assigns, be enjoined from using and occupying any building on said lot as a flat, apartment house or duplex house for fifteen years from February 11, 1910.

The answer admitted the incorporation of the plaintiff and of the defendant Hancock Investment Company and denied every other allegation in the petition.

The evidence shows that about the first part of July, 1911, the defendant company began the foundation for a duplex house, which was to be erected according to the plans used in the erection of another duplex house located elsewhere in the city. It is nowhere specifically stated what a duplex house is, but we assume it is what its name indicates, a double house or a house in duplicate. About July 20, 1911, the defendant company was notified in writing that the building contemplated would be against the covenant in defendant's deed and in all deeds to lots in that addition. In response to this notification, the defendant's president and chief owner wrote a letter saying: "I originally planned to fit the second floor so it might be occupied by another family but on account of the objections of those residents in the block who are to be our neighbors, I have changed the plans to make but a single residence of the building." Notwithstanding this promise, however, the house was built accord-

Land Co. v. Investment Co.

ing to the plan of the other house referred to, and as originally decided upon. In August, when it was seen that no change had been made in the plan of the house, the suit was brought.

The evidence further clearly discloses that the form, shape, location and arrangement of the rooms on the ground floor were identical with those on the second floor, with the exception of a slight difference caused by the vestibule on the first floor and the stairway on the second. The vestibule was arranged so that all that is needed to shut the entire ground floor from it is a door hung in the hallway or space left therefor. So that, with but slight effort and expense, this front entry could be so arranged as that a person going into the front door could go to the apartments on either floor without entering or disturbing in any way the occupants on the other floor. There is no way of going from the second floor to the first nor means of communication from one to the other except down this front stairway which lands in the vestibule. The water and gas pipes are put in such way as that each floor can be separately served, but after the suit was brought, the pipes and the place for the connections on the second floor were plastered over and there is now but one gas meter and one water meter in the basement. The doorbell buttons were put on at the front entrance, and two furnaces, not connected with each other, were installed in the basement, one arranged so as to heat the first floor and the other the second floor and neither can heat both. There is a bath room on each floor. In fact there is no doubt but that, as arranged, the house can be easily used as separate apartments, that is, a family can easily reside on each floor.

There was some attempt on the part of defendant to show a change of plan in the house after the filing of suit, but, if there was a change it was a change of intention in the minds of defendants rather than a

change in the plan of the house. The architect and others testified there was no change in the plans or rather that the house was constructed according to the plan originally decided upon. The only change actually made in the construction of the house consisted in taking out some electric light wires in the up-stairs dining room, which had been put in so as to distribute the lights as they would be in a dining room. The gas and water service down stairs could be easily duplicated up-stairs simply by rubbing off the plaster and attaching the fixtures to the connections that are in the wall. These facts are stated to show that, if the covenants forbid a house built so as to permit a different family to reside on each floor at the same time, although all is under one roof and enclosed by four walls so as to constitute one bu_ding, then the building in question is, in our opinion, within the terms of the covenants.

It will be noticed, however, that the petition asks that its erection be enjoined, *or,* that its *use as a double apartment or flat* be prevented. In view of the fact that, so far as outside appearance is concerned, the house is but one house and has no appearance of being double, and that it can be and is now used only as a single dwelling, and great hardship and loss would accrue if it were ordered removed, and the further fact that suit was not brought until after its construction was well advanced, and equity can be accomplished without such drastic measures, the chancellor who tried the case was right in not ordering the house removed. The question involved in this appeal, however, is whether he did right in granting a new trial in order that the alternative relief prayed for in the petition might be given.

The learned chancellor, after hearing the evidence, found for defendants and dismissed plaintiff's bill. On a motion for new trial this judgment was set aside, the learned chancellor saying he did so ''for the

reason that the court is of the opinion that the finding is against the law and the evidence in so far as the plaintiff is entitled to a restraining order to the effect and for the purpose of prohibiting said property from being converted into and occupied as an apartment house during the period covered by the restrictions in the deed, and that the finding should have been for the plaintiff and the relief to that extent granted.'' From this order granting plaintiff a new trial defendants have appealed.

The opportunity of the trial judge to see the witnesses, to estimate their character and weigh their evidence and know what are the real facts in the case, are so great that his judgment in granting a new trial ought not to be interfered with by an appellate court, unless it clearly appears that his action is based on an erroneous view of the law, or that he is, beyond question, misled or mistaken as to the facts. And in the latter case it will often be better for an appellate court to defer to his judgment in granting a new trial than to shut off all attempts to obtain justice by reversing his judgment on that matter. In many cases, if justice is not obtained in the trial court, it is not secured elsewhere. The trial judge has many responsible duties to perform, and one of the most solemn and important of them all is the unpleasant but imperative duty to grant a new trial when, in his conscience, he feels that justice demands it. But if the appellate court does not show a disposition to defer to his judgment in the matter of granting a new trial, he will feel tempted, at least, to avoid an unpleasant duty and throw the responsibility on the final arbiters of the case. For these reasons the judgment of the chancellor, in the case before us, granting a new trial should not be disturbed unless he is clearly in error as to the law when applied to the facts in the case. But in applying the law to the facts the trial court says that his

169 Mo. App.—46

finding is against the law and the evidence so far as concerns plaintiff's right to an order preventing said property from being converted into and used an an apartment house during the period covered by the fifteen years. So that, the only question for us to consider is whether the trial court erred as to the law on this particular question.

When covenants in the nature of restrictions on the fee are reasonable and within the policy of the law, they are valid. [6 Am. & Eng. Ency. of Law (2 Ed.), 513.] When clearly expressed, covenants of this description will be strictly enforced and a court of equity will decree an injunction. [Lloyd on Building, sec. 149, page 288.] Although restrictions on the fee are not favored, yet when the intention of the parties is clear, courts will enforce them. [Hutchinson v. Ulrich, 145 Ill. 336; Kitchen v. Hawley, 150 Mo. App. 497.] The intention of the parties must be determined from the language of the covenant itself considered in connection with the surrounding circumstances at the time the covenant was made (*Ibid.*); or, as it is sometimes said, from the language of the covenant itself considered in the light of the entire context of the instrument containing it. [Kitchen v. Hawley, 150 Mo. App. 497.] Such covenants must be considered with reference to the situation of the property affected and its present and prospective use as well as to the language employed in expressing the covenant. [St. Louis Deposit Bank v. Kennet, 101 Mo. App. 370, l. c. 388.] And where the covenants are in reality an express contract that a certain status shall not be altered, the essential fact is the *breach* rather than the *injury*. If parties settle their rights in regard to a parcel of land by covenants, these must be observed whether their nonobservance will inflict injury or not. A plaintiff may restrain a continuous breach which is *beneficial* to *him* and may stand on the very letter of his obligation, for a party may not make a solemn en-

gagement and then disregard it on the ground that no harm will result. [Bank v. Kennet, supra, l. c. 389; Hall v. Wesster, 7 Mo. App. 56; Sanders v. Dixon, 114 Mo. App. 229, l. c. 246.]

The terms of the covenant, as expressed in the first clause hereinabove set out, clearly exclude and forbid flats and apartment houses. And it is also directed at the *occupancy* and *use* of buildings as such. That is, although the building may not in its exterior appearance be an apartment house and may not be internally arranged so as to contain flats or constitute it an apartment house, yet if it is occupied and used as such, then it is within the things forbidden by the covenant. Strictly speaking, a flat is one floor or portion of a house which forms a complete residence in itself. Therefore the term "flat" is not synonymous with "apartment house." The latter term connotes an entire building; while the former means only the separate residential portions inside the building. So that, the clause forbids not only a building designed for an apartment house or constructed with flats therein, but it also forbids the use and occupancy of a house in such way as to turn it into flats or make it an apartment house. The second clause of the covenant does not contradict this, but, if anything, rather enforces it. The first clause deals with the occupancy and use of the building on the lot, confining both the building and lot to residence purposes only, and by the words "which is to be taken to exclude flats and apartment houses" definitely and emphatically excludes and forbids plural occupancy. The second clause, in forbidding more than one residence, deals with the number of buildings to be constructed on the lot. The covenants, therefore, in the deed before us were intended to prevent plural occupancy and also plural structures. In the Illinois case cited above, it was held that the restrictive covenants referred to structures only and not to the particular manner of

residential use and hence did not exclude plural occupancy. In Stone v. Pillsbury, 167 Mass. 332, the covenant was not against the use of a building but against anything other than one dwelling house. The words were not plain enough to forbid plural use, and as doubts are to be resolved in favor of the grantee, the court decided for defendant. In Pank v. Eaton, 115 Mo. App. 171, the only covenant broken was one providing that not more than one house should be erected on each forty feet of frontage. And the court had to determine whether the structure proposed was more than one house, and, at page 176, the court says the covenant therein considered was not intended to prevent plural occupancy as did the Sanders case in the 114 Mo. App., but to exclude plural structures rather than plural uses. The court, on page 177, also says that the covenant in Harris v. Roraback, 100 N. W. 391, was manifestly designed to prohibit the occupancy of the lot by more than one family as a place of residence. In this Pank case also, BLAND in concurring, says that if it were not for the context he would hold that the covenant meant to exclude one building arranged for two families. The covenants contained in the deed before us, however, are much broader than were the covenants in the cases cited, and hence they apply not only to the building as a structure but to the character of the residential use as well.

Appellants do not seriously dispute this, their main contention being that a new trial should not have been granted because there is nothing in the evidence to justify the court in granting plaintiff relief to the extent of forbidding the use of the house in the future as a flat or apartment house. This contention is based on the assumption that the house as built is not within the forbidden terms of the covenant. As stated before we think it is, but for the reasons there stated we do not think the house should be removed. Equity, *under the circumstances of this case,* will be accomplished

by simply enjoining defendants from *using* the property in the future, in the way forbidden, during the fifteen years.

But defendants say that the house is not being so used now, and that equity will not interpose merely to allay plaintiff's fears or apprehensions that the covenants might be violated in the future. And in support of this they cite Lester Real Estate Co. v. City of St. Louis, 169 Mo. 227; 2 Story's Eq. Jur. (13 Ed.), sec. 924a, page 226, and Danforth v. Foster, 158 Mo. App. l. c. 104. The rule laid down by these authorities is undoubtedly correct, but, in the case now considered, there is more than mere groundless fears and apprehension. The defendants were warned not to build the kind of house they were proposing to build. Apparently they considered that the house contemplated was forbidden, but promised to change the plan of the house so as to make it a residence for the sister of one of the defendants. Relying on this promise plaintiff took no steps by suit at that time to prevent its erection. But, notwithstanding the promise, the house was actually built according to the plan originally determined upon. It was constructed so as to contain a flat on each of the two floors, and with little or no change can be exactly adapted thereto and used in that way. The title is in the defendant corporation. It is not the owner, but only. one of the individual defendants, who says it will not be used in a forbidden way in the future. There is, therefore, more than mere unfounded apprehension on the part of plaintiff. There is enough to show that not only have the restrictive covenants been violated in the character of the building erected but the forbidden use is likely to follow in the future. If there is a well grounded apprehension or a reasonable probability that the covenants will be broken this is sufficient. [1 Beach on Injunc., sec. 17.] In the Lester case, supra, the court says, on page 231, that the defendant showed not only

that it abandoned its purpose to do the act threatened, but that there was no room for even apprehension that the act would be committed.   In Danforth v. Foster, 158 Mo. App., cited above, the trial judge was satisfied that it was not defendant's intention to do the alleged threatened act, and the finding of the trial court was deferred to.   In the case at bar evidently the trial judge was of the opinion that there was great probability of forbidden use in the future as he granted a new trial solely that relief against this feature might be given, and in doing so, says the failure of the judgment to give such relief is against the evidence.

In addition to all this the fact that the judgment denied all relief would give at least color of reason for supposing that the use of the house for flats was not forbidden and thus lead to such use.   And if the plaintiff acquiesced in such judgment, there might be room for the claim that the right to object to such use had been waived or finally adjudicated.   The constructtion of the house was such as to bring it within the things forbidden by the covenant, and for this reason jurisdiction in equity to act on the case attached.   This being so, why should not the court give such relief as plaintiff in equity is entitled to, instead of dismissing the petition and leaving plaintiff to the probable necessity of another suit in the future?   Especially is this true, where, on account of the way the parties have acted, there is reasonable ground for apprehension that such necessity will arise, and if it should, a new suit would have to meet and overcome the objection that the matter had been once adjudicated.

For all these reasons the judgment of the chancellor granting a new trial is affirmed.   All concur.